Argued June 1, demurrer to alternative writ sustained June 16, 1914.

## BRANCH *v.* ALBEE, Mayor.*

(142 Pac. 598.)

**Constitutional Law—Construction of Constitutional Provisions—General Rules.**

1.   A constitutional provision must be construed as a whole, and, if possible, so that each part will harmonize with all others, without distorting the meaning of any, to the end that the intent of the framers may be ascertained and carried out.

[As to rules for construction of statutes, see note in 12 Am. St. Rep. 826.]

**Municipal Corporations—Charter—Amendment.**

2.   Under Article XI, Section 2, of the Constitution, as amended, providing that corporations may be formed under general laws, but shall not be created by the legislative assembly by special laws, that the legislative assembly shall not enact, amend, or repeal any charter or act of incorporation for any municipality, city, or town, and that the regular voters of every city or town are granted power to enact and amend their municipal charter subject to the constitutional and criminal laws of the state, and Article IV, Section 1a, reserving the

---

*On the question who are city officers, see note in 14 L. R. A. 646.
                                                                        Reporter.

initiative and referendum powers to the regular voters of every municipality as to municipal legislation, the legislative assembly cannot amend the charter of a municipal corporation either by special or general act.

**Municipal Corporations—"Municipal Officer"—Policeman.**

3. Policemen of the City of Portland, selected and paid for their services by the city, whose duties under the charter are largely municipal and confined to boundaries of the city, but who are peace officers and make arrests for crimes against the state, are "municipal officers," and not state officers.

**Municipal Corporations—Charter—Amendment—Constitutional Provision.**

4. Laws of 1913, page 548, providing for a police relief, health, disability, and pension fund in cities having more than 50,000 inhabitants and creating a board of police and pension relief, applying only to the City of Portland, and changing the police pension plan provided by the charter of that city adopted by referendum, is an amendment of the city charter in violation of Article XI, Section 2, of the Constitution, prohibiting the legislative assembly from amending municipal charters.

[As to validity of statute or ordinance providing for pensions for municipal employees, see note in Ann. Cas. 1912C, 545.]

Original proceeding in Supreme Court.

In Banc.    Statement by MR. JUSTICE RAMSEY.

This is an original *mandamus* proceeding commenced in this court by Benjamin Branch, the petitioner, to obtain a writ of *mandamus,* compelling H. R. Albee, as Mayor, John Clark, as Chief of Police, Wm. Adams, as City Treasurer, constituting the Board of Police Pension and Relief of the City of Portland, to retire him, as a member of the police force of Portland, upon a pension, in accordance with the provisions of Chapter 287 of the Laws of 1913. The facts are stated in the opinion of the court.

DEMURRER TO ALTERNATIVE WRIT SUSTAINED.

For petitioner there was a brief over the names of *Mr. Ralph E. Moody* and *Messrs. Sinnott & Adams,* with oral arguments by *Mr. Loring K. Adams* and *Mr. Moody.*

For defendants there was a brief with oral arguments by *Mr. Walter P. La Roche* and *Mr. H. M. Tomlinson.*

MR. JUSTICE RAMSEY delivered the opinion of the court.

This is a *mandamus* proceeding commenced in this court to obtain a writ of *mandamus,* commanding H. R. Albee, as mayor of the City of Portland, John Clark, as chief of police, and Wm. Adams, as city treasurer, constituting the board of police pension and relief of the City of Portland, to retire him upon a pension, in accordance with the provisions of Chapter 287 of the Laws of 1913, enacted by the legislative assembly. By this act of the legislative assembly, the mayor, the chief of police, and the treasurer of every city in the state having more than 50,000 inhabitants are, in addition to the duties required of them, constituted a board of police pension and relief. The title of this act is as follows:

"An act to create a police relief, health, disability and pension fund in cities of the state, having more than 50,000 inhabitants, providing for the disbursement thereof, and creating a board of police pension and relief."

Section 3 of this act provides for a police relief, and pension fund to be obtained from the following sources: Not more than 1 per centum of all moneys collected from licenses for the keeping of places in which spirituous, malt, or other intoxicating liquors are sold; not more than one half of all moneys received from taxes or licenses upon dogs; all moneys received from the sale of unclaimed property; not more than 10 per cent of all moneys received from licenses from pawnbrokers, second-hand stores, junk dealers, and for

conducting billiard, pool or pigeon-hole tables or billiard or pool rooms; all moneys received from fines for carrying concealed weapons; not more than 5 per cent of all fines received in money for violation of city ordinances, and the treasurer of the city is required to retain from the pay of each member of the police department of said city a sum equal to 1½ per cent of the monthly compensation paid each member for his services as such police officer.

Section 4 of said act provides, in substance, that when any person who is 60 years of age, and has served as a regular policeman for such city for 20 years or more in the aggregate, the board shall order that such person shall be retired from further service in such police department, and from the date of the making of such order the service of such person in said police department may cease, and such person so retired shall thereafter, during his lifetime, be paid from such fund a yearly pension equal to one half the amount of salary attached to the rank which he may have held in said police department for the period of one year next preceding the date of such retirement.

Section 5 of said act provides for retiring policemen who are disabled in the performance of their duties, and the payment to them during their lives of an annual pension equal to one half of the salary that they are receiving from the city. This section provides, also, that if a person pensioned for disability recovers from the injury, the pension granted him shall cease. Section 7 of this act provides, also, for granting pensions to the widows and children of policemen who lose their lives while in the performance of their duties as policemen. This act contains many other provisions that need not be stated in this opinion.

An alternative writ of *mandamus* was issued and

served on the defendants, and the defendants, for the purpose of showing cause against awarding a peremptory writ, have demurred to the alternative writ, alleging that it does not state facts sufficient to entitle the petitioner to a writ of *mandamus,* etc.

The defendants, by their demurrer and their brief, contend that said act of the legislative assembly is unconstitutional, and hence invalid, and this contention presents the only question for decision.

The legislative assembly in 1903 enacted a new charter for the City of Portland, and Sections 196, 197, and 198 thereof provided for the granting of pensions to members of the police and fire departments of said city. Section 196 authorized the executive board therein named to assess to each member of the police and fire departments a sum to be deducted from his monthly salary, not exceeding 50 cents per month, which sum was required to be paid to the city treasurer, and to be placed to the credit of the police and fire departments relief fund, to be used exclusively for the relief of the sick and disabled members of said departments, and for funeral expenses, and for relief of the families of deceased members and for pensions. Section 197 of the charter provides for obtaining other funds for the relief of policemen and firemen, and Section 198 provides for the payment of pensions, under certain conditions, to members of the police and fire departments, etc. The said charter provisions provide a complete scheme for pensioning members of the police department, but the amounts to be paid are much less than the amounts provided for by the act of 1913. There are other material differences between the two schemes. The charter enacted in 1903 was in force when the act of 1913 was passed. The charter of 1903 required the city to pay certain pensions and

to grant certain relief to members of the police department and their families.    The act of 1913, relating to cities having more than 50,000 inhabitants, but in fact applying only to the City of Portland, requires the City of Portland to pay to members of the fire department, under the conditions stated therein, much larger pensions than were required by the charter to be paid. This court is required to determine whether the said act of 1913 is constitutional.    Counsel for defendants state the question for decision thus:

"The question for the court to decide is whether the legislature has power to compel the City of Portland, without its consent or approval, to comply with an act that pertains to the management of local and municipal affairs.    Does this act infringe upon the city's rights to local self-government?    Are the people of the city subject to the will of the legislature in the management of purely local municipal business in which the state at large is not interested, and which is not of interest to any outside the local municipality?    Can the legislature compel the city against its will to tax itself and spend its money for matters not affected with a state interest?"

1. In construing a constitutional provision, the whole provision is to be examined with a view to ascertaining the meaning of every part.    The presumption is that every clause has been inserted for some useful purpose, and therefore the instrument must be construed as a whole, in order that its intent and general purposes may be ascertained; and, as a necessary result of this rule, it follows that, wherever it is possible to do so, each provision must be construed so that it will harmonize with all others, without distorting the meaning of any of such provisions, to the end, that the intent of the framers of the provision may be ascer-

tained and carried out, and effect be given to the instruments, as a whole.

8 Cyc., pages 729, 930, says:

"A written Constitution is to be interpreted and effect given to it as a paramount law, to which all laws must yield, and it is equally obligatory upon all departments and individual citizens alike.

"It is not always necessary, in order to render a statute invalid, that it should contravene some *express* provision of the Constitution; if the act is inhibited by the general scope and purpose of the instrument, it is as much invalid as though prohibited by the express letter of some of its provisions. Therefore the implied powers and restraints to be found in a Constitution are a very important part of it. * *

"The purpose of construction, as applied to a written Constitution, is to give effect to the intent of the framers and of the people who had adopted it; and it is a rule of construction, applicable to all Constitutions, that they be construed so as to promote the objects for which they were framed and adopted; and to accomplish this result the extremes of both a liberal and a strict construction are to be avoided, and technical rules are to be excluded."

2. Section 2 of Article XI of the state Constitution, prior to its recent amendments (omitting the latter part thereof which does not relate to the point under consideration), was as follows:

"Corporations may be formed under general laws, but shall not be created by special laws, except for municipal purposes."

Under said provision general laws could be and were passed for the formation of both private and municipal corporations; but only municipal corporations could be created by *special* laws. Said Section 2 was amended, and at the time that the said act of 1913 was passed by the legislative assembly, the portion of said

section relating to the question under consideration was as follows:

"Sec. 2. Corporations may be formed under general laws, but shall not be created *by the legislative assembly* by special laws. The legislative assembly shall *not* enact, amend or repeal any charter or act of incorporation for any municipality, city or town.

"The legal voters of every city and town are hereby granted power to enact and amend their municipal charters, subject to the *Constitution* and *criminal* laws of the State of Oregon," etc.

This section must be construed so as to give meaning to every provision thereof. The first clause provides that corporations may be formed under general laws, that being the language used in the original section. The next clause provides that corporations "shall not be created *by the legislative assembly* by special laws." The phrase "by the legislative assembly" was not in the original section, and it must have been added for some reason. If the intention had been to prevent the creation of municipal corporations by special laws, the phrase "by the legislative assembly" would not have been added. As this section now stands, the people of the state are not prohibited from enacting, by the initiative, general or special laws for the government of municipalities, but the legislative assembly is expressly prohibited from passing special laws creating either private or municipal corporations.

Said Section 2, as amended declares that:

"The legislative assembly shall *not* enact, amend or repeal any charter or act of incorporation for any municipality, city or town."

This expressly *prohibits* the passage of any law by the legislative assembly enacting, amending, or re-

pealing any charter of any town or city. The prohibition is *absolute*. It does not say that the legislative assembly shall not do these things by a *special* law; but that it shall not do them at all. Before the amendment of said Section 2 the legislative assembly had power, by general or special laws, to create or provide for the creation of municipal corporations, and to enact, amend, or repeal their charters; but by the said amendment *all these powers are expressly withdrawn.* After withdrawing from the legislative assembly all power to enact, amend, or repeal charters or acts incorporating cities or towns, said Section 2 provides as follows:

"The legal voters of every city and town are hereby granted power to enact and amend their municipal charter, subject to the *Constitution* and *criminal* laws of the State of Oregon."

Said section, as amended, first withdraws from the legislative assembly all power that it previously had to enact, amend, and repeal charters, and then confers upon the legal voters of every city and town power to enact and amend their charters, and this power, thus conferred upon cities and towns, is made subject to the *Constitution* and the *criminal* laws of the state. It is not made subject to the *civil* laws of the state. The conclusion seems to be irresistible that the people, by the adoption of said amendment, intended to withdraw from the legislative assembly all power that it previously possessed to enact, amend, or repeal charters or acts incorporating cities or towns, and to confer upon the legal voters of cities and towns all of said power, *except* the power to *repeal* charters. If effect is given to the language of this amendment, no other conclusion appears to be tenable.

The amendment to said Section 2, referred to *supra,* was adopted by the people on June 4, 1906. Said section was amended again on November 8, 1910, by adding a clause vesting in municipalities exclusive power to license or prohibit the sale of intoxicating liquors therein, but this last amendment did not change said section as to the matters under consideration.

On June 4, 1906, the people adopted also an amendment to Article IV of the Constitution, which is designated as "Section 1a" of said article, and the following portion of said section should be considered as relevant to the question under consideration:

"The initiative and referendum powers reserved to the people by this Constitution are hereby further reserved to the legal voters of every municipality and district, as to all local, special and municipal legislation of every character, in or for their respective municipalities and districts. The manner of exercising said powers shall be prescribed by general laws, except that cities and towns may provide for the manner of exercising the initiative and referendum powers as to their municipal legislation."

This provision was adopted at the same time that the amendment to Article XI, Section 2, was enacted, and the two amendments should be construed together.

The said amendment to the Constitution made radical changes as to the powers of cities and towns, and the obvious intention of the framers of said amendments and of the people who adopted them was to grant to cities and towns autonomy or local self-government. These provisions are not ambiguous or uncertain in meaning. Construing the terms of these amendments according to the ordinary meaning of the words used, it is clear that the intention of their framers and of the people who adopted them was to free cities and towns from the control of the legislative

assembly, and to confer upon them full power to legislate for themselves as to all local, municipal matters. Under the terms of these amendments all legislation by cities and towns is subject to the Constitution and *criminal* laws of the state, and hence any legislation by them that contravenes the Constitution or the *criminal* laws of the state is invalid. It is a fact worthy of mentioning that when the framers of the amendment of Section 2, *supra,* were stating the limitations upon the powers of the legal voters of cities and towns to enact and amend their charters, they stated that such powers were to be subject to the *criminal* laws, but omitted to make them subject to the *civil* laws of the state. The maxim, *"expressio unius est exclusio alterius,"* would seem to apply here in construing said provisions.

This court, in the case of *State ex rel. v. Portland,* 65 Or. 273 (133 Pac. 62), used this language:

"By Article XI, Section 2, of the Constitution as amended June 4, 1906, the legal voters of cities were given power to enact and amend their municipal charters, subject only to the Constitution and to the criminal laws of the state. * * *It is settled that since the constitutional amendment last cited the legislature cannot repeal or amend a municipal charter,* and, if the municipality cannot do it, then it sits clothed in a suit of steel armor, riveted and bolted so securely that only by an appeal to the people of the whole state can the burden be removed."

In *Thurber* v. *McMinnville,* 63 Or. 415 (128 Pac. 44), the court, speaking of the powers of cities, says:

*"Inside their boundaries,* and in relation to matters purely local, *they are,* as regards regulation by the state legislature, *supreme;* beyond these boundaries they are invested with no power, except that which the legislature may see fit to grant them in common with all other cities, and under like circumstances."

In the case of *City of Portland* v. *Nottingham,* 58
Or. 1 (113 Pac. 28), this court, referring to Article XI,
Section 2, of the Constitution, says:

"This provision of the Constitution was adopted by
the people at the June election of 1906. * * Its effect
*is to take from the legislative assembly the right to
amend the charter* of the City of Portland, although
enacted by the legislative assembly itself in January,
1903. * * These constitutional provisions confer *am-
ple and exclusive powers upon the people of every
municipal corporation to regulate their own affairs
respecting municipal legislation* and procedure. The
legislative assembly cannot pass laws to repeal or
amend municipal charters, *even by implication,* re-
specting such matters. On those subjects the charter
of the City of Portland is complete within itself, and
is subject only to the Constitution and the criminal
laws of the state."

In *Straw* v. *Harris,* 54 Or. 437 (103 Pac. 782), the
justice delivering the opinion says, *inter alia:*

"The state, therefore, *regardless of any declaration
in its Constitution to the contrary,* may at any time
revise, amend, or even repeal any or all of the charters
within it, subject, of course, to vested rights and limi-
tations otherwise provided by our fundamental laws.
This, under the Constitution as it now stands, may be
done *by the legislature* through general laws," etc.

This statement is mere *dictum,* and the writer of
this opinion cannot approve it.

Article XI, Section 2, expressly declares:

"The legislative assembly shall *not* enact, amend, or
repeal any charter or act of incorporation for any mu-
nicipality, city, or town."

The Constitution does *not* provide that the legisla-
tive assembly shall not enact, amend, or repeal a city
charter *by special laws.* It declares that said body

shall *not* enact, amend, or repeal a charter, and the meaning of this provision is that it shall not do that *in any manner. The inhibition is absolute.*

The *dictum* cited *supra,* from the opinion of *Straw* v. *Harris,* appears to the writer of this opinion to contravene both the letter and the spirit of Section 2, *supra.* To construe Section 2 according to said *dictum* would, in effect, practically *nullify* the amendments contained therein. The amendments contained in that section were obviously intended to prohibit all legislation by the legislative assembly affecting charters of towns or cities. It was not intended merely *to change the method* of enacting, amending, or repealing charters.

In *Kalich* v. *Knapp* (Or.), 142 Pac. 594, recently decided by department No. 1, but not yet officially reported, it was held that the legislative assembly cannot constitutionally enact a law regulating the speed of vehicles on the streets of Portland. That decision supports our conclusion in this case.

Our intention has been called to decisions of courts of other states, but most of these decisions are of little value in this case, because no other state has constitutional provisions similar to ours as to the powers of cities and towns.

3. Policemen of the City of Portland are selected and paid for their services by the city, and, according to Section 189 of the charter of said city, their duties are very largely municipal and confined to boundaries of the city. They are peace officers, and make arrests for crimes against the state, etc.

Black, in his Law Dictionary, defines a municipal officer as: "An officer belonging to a municipality."

Section 1745, L. O. L., defines a peace officer thus:

"A peace officer is a sheriff of a county or constable of a precinct, marshal, or policeman *of a town.*"

We would hardly say that a sheriff of a county, or a constable of a precinct, is a *state* officer, although he may attend to state business. A sheriff is a county officer, and a constable is a precinct officer. As a policeman is elected or appointed by a city, and his salary is paid by a city, and most of his duties are municipal, he is, in a proper sense, a city officer, although he is a peace officer, and may make arrests under state laws.

In *Popper* v. *Broderick,* 123 Cal. 460 (56 Pac. 53), the court held that the police department of San Francisco was a municipal affair.

In *Buckner* v. *Gordon,* 81 Ky. 672, the court says:

"Any officer who is charged with duties pertaining to the city or town government, * * is an officer of a city or town within the meaning of the sixth section."

In some states police commissioners for cities are appointed by the state, and these commissioners appoint the police force. This was the law in Portland in 1885: See *State* v. *Simon,* 20 Or. 368 (26 Pac. 170). But under the present charter, the city appoints or selects its police force and pays their salaries. These policemen are city officers in the same sense that a sheriff is a county officer and a constable is a precinct officer.

4. The act of 1913, referred to in the alternative writ, which attempts to create a police relief, health, disability, and pension fund in cities having more than 50,000 inhabitants, and provides for the disbursement thereof, and creates a board of police and pension relief (Laws 1913, p. 548) is an attempt to amend, *by indirection* the charter of the City of Portland, and to compel said city to pay to its police force, under stated

conditions, pensions equal to one half the salaries now paid them. According to statements made at the argument, these pensions would amount to $50 a month for each pensioner. According to this act, these pensioners are to be paid by the city. Under the provisions of the charter, the city is required to pay pensions amounting to one fifth the amount required by this act to be paid. By this act, the legislative assembly intended to compel the city to pay this large increase in pensions, and the effect of this act is to amend, by implication, the city's charter. This act, in its entirety, is purely municipal. Every provision of it relates to municipal and not to state matters. It provides for pensions and relief for city officers, and provides for payment of the pensions and relief from city revenue. No person outside the city has any interest in it, unless he has property subject to contribution to this fund. Only city property and city business are required to contribute to the fund for the payment of the pensions and relief.

While this act purports to apply to all cities in the state having more than 50,000 inhabitants, it is a fact that when it was passed there was not a city in the state, except Portland, that had even 20,000 inhabitants and it is not probable that there will be another city in the state having more than 50,000 inhabitants within the next 25 years. Hence this act applies, and was intended to apply, only to the City of Portland. It was framed so as not to apply to any other city. It is obvious that the sole object in passing it was to amend, by indirection, the sections of the charter of Portland relating to relief and pensions for members of the police department, and if it were valid, it would have that effect, and this act would take the place of the sections of the charter referred to *supra.*

We are not much concerned as to the policy that prompted the passage of this act. The granting of said pensions and relief affected only *persons in the city,* and why the legislature, a large majority of whose members resided in other parts of the state, forced this act upon Portland it is difficult to comprehend. It would seem that persons, not residing in Portland, would see the propriety of permitting Portland to legislate for herself as to her own affairs. A city with about a quarter of a million of inhabitants is surely capable of self-government.

In *Board of Park Commissioners* v. *Common Council of Detroit,* 28 Mich. 241 (15 Am. Rep. 202), Judge COOLEY says *inter alia:*

"Whoever insists upon the right of the state to interfere and control by compulsory legislation the action of the local constituency in matters exclusively of local concern, should be prepared to defend a like interference in the action of private corporations and of natural persons. It is as easy to justify on principle a law which permits the rest of the community to dictate to an individual what he shall eat, and what he shall drink, and what he shall wear, as to show any constitutional basis for one under which the people of other parts of the state, through their representatives, dictate to the City of Detroit what fountains shall be erected at its expense for the use of its citizens, or at what cost it shall purchase, and how it shall improve and embellish a park or boulevard for the recreation and enjoyment of its citizens. The one law would rest upon the same fallacy as the other, and the reasons for opposing and contesting it would be the same in each case."

In *People* v. *Lynch,* 51 Cal. 34 (21 Am. Rep. 677), Justice MCKINSTRY says:

"An attempt by the state legislature to order an improvement within the limits of an incorporated city,

and to levy an assessment to pay for it, is as clearly a violation of the independence of action guaranteed by the Constitution to the local legislative assembly as is a mandate directed to that assembly, commanding them to make such improvement, and to borrow money, or to tax all, or a portion, of the citizens to pay for it, contrary to the wish of the assembly, and to that of the local community whom they represent. Such law is unconstitutional because it is mandatory in its nature, and deprives the board of trustees, or legislative department of the city government, by whatever name it be known, of all choice or discretion in reference to the improvement."

In 1 McQuillin, Municipal Corp., Section 100, the author says:

"American cities labor under the difficulty of not being allowed to conduct their own local affairs. To bring about free and self-governing communities changes are indispensable in state Constitutions, state statutes, and municipal charters. The state should give its municipal corporations full right to exist and ample power to perform their functions, and then cease tampering with local affairs. The legislatures are constantly interfering with purely municipal matters without the consent, and usually against the protest, of the local authorities and the inhabitants. A city is usually regarded as in the nature of a subject province or dependency, at all times to be controlled by the state or external authority. Manifestly, to attain the highest efficiency in administration, the city should be a self-governing body, privileged within its local sphere to originate and administer all governmental functions which the local public interests or its inhabitants, as a compactly settled community, require. It should be a government expressive of the will of the people who reside within its corporate limits.

"A complete self-governing community means: First, power to decide all questions of local public

policy; second, power to execute or administer that policy; and, third, power to compel obedience to its mandates as a governmental organ."

The amendments contained in Article XI of Section 2 and Article IV of Section 1a of the Constitution were adopted to remedy the evils mentioned in the extract from Judge McQuillin's work, cited *supra.*

We hold that Chapter 287, page 548, of the Laws of 1913, passed by the legislative assembly, was an attempt, by implication, to amend Sections 196, 197 and 198 of the charter of the City of Portland, in violation of Article XI, Section 2, of the Constitution, and that it is invalid.

We hold that the creation of a pension department in a city for the benefit of members of the police department of that city, and the collection of revenue from the citizens and business of a city to pay said pensions are city business, and that legislation providing therefor is properly municipal legislation within the meaning of Article IV of Section 1a of the Constitution.

We do not hold that cities can, by virtue of Article XI, Section 2, and Article IV of Section 1a of the Constitution, extend their authority and jurisdiction over subjects that are not properly municipal and germane to the purposes for which municipal corporations are formed. We use the word "municipal" as signifying what belongs to a city.

We base our decision upon the amendments to the Constitution referred to *supra.* If the people do not want the cities of the state to have local self-government, they can amend the Constitution so as to place them again under the power of the legislative assembly.

The demurrer to the alternative writ of mandate is sustained.    DEMURRER SUSTAINED.

MR. CHIEF JUSTICE McBRIDE and MR. JUSTICE BURNETT dissent.