Argued September 20; peremptory writ allowed
October 18, 1934

BURTON *v.* GIBBONS
(36 P. (2d) 786)

*William M. Briggs,* of Ashland, *Frank S. Grant,* of Portland, and *Fred H. Paulus,* of Salem (Wallace Benson, of Reedsport, Frank J. Van Dyke, of Ashland, Frank P. Farrell, of Medford, John Mullen, of North Bend, E. O. Stadter, of Bend, and C. Schuebel, of Oregon City, on the brief), for plaintiff.

*John W. Shuler,* of Portland, for defendant.

RAND, C. J. Under chapter 156, Oregon Laws, 1933, the governing body of a city or town, whose bonds have matured or are about to mature, is authorized, without being required to submit the matter to the legal voters and without any authority therefor in its charter, to issue and sell or exchange refunding

bonds in an amount not exceeding the par value of said outstanding and unpaid bonds less whatever sum may be in the sinking fund applicable to their payment. This is a general law applicable alike to all incorporated cities and towns in the state.

The city of Reedsport is an incorporated city and the defendant, J. L. Gibbons, is the recorder thereof. On August 27, 1934, it had outstanding and unpaid matured, or about to mature, water bonds aggregating the sum of $140,500 and no sinking fund applicable to their payment. On said day and pursuant to said act, an ordinance was passed by its council and signed and approved by its mayor, providing for the issuance and sale or exchange of refunding bonds in an amount equal to the par value of said bonds so outstanding.

The charter of the city of Reedsport, by section 38, paragraph 4, provides that before an ordinance can go into effect it shall be attested by the recorder and either be published in the official newspaper or be posted in three public places within the city. Also, by section 42, it limits the borrowing of money by the city to an amount not exceeding $5,000 exclusive of water bonds.

Because of this latter provision in the charter and also because of his contention that chapter 156, Oregon Laws, 1933, was in conflict with Article IV, section 1a, and Article XI, section 2, of the state constitution and, therefore, invalid, the defendant recorder refused to attest and publish or post said ordinance.

A writ of mandamus was thereupon issued out of this court, requiring the defendant either to perform or show cause for not having done so. The cause shown is by demurrer to the writ and the same contentions are again urged as a justification for his refusal to act.

Article IV, section 1a, as adopted on June 4, 1906, reads in part as follows:

"The initiative and referendum powers reserved to the people by this constitution are hereby further reserved to the legal voters of every municipality and district, as to all local, special, and municipal legislation, of every character, in or for their respective municipalities and districts. The manner of exercising said power shall be prescribed by general laws, except that cities and towns may provide for the manner of exercising the initiative and referendum powers as to their municipal legislation."

On the same day, by another initiative amendment, Article XI, section 2, was amended to read as follows:

"Corporations may be formed under general laws, but shall not be created by the legislative assembly by special laws. The legislative assembly shall not enact, amend or repeal any charter or act of incorporation for any municipality, city or town. The legal voters of every city and town are hereby granted power to enact and amend their municipal charter, subject to the constitution and criminal laws of the state of Oregon."

This last section was further amended in 1910 by adding another clause which, however, has no application to the questions involved here.

It has repeatedly been said that the purpose of these amendments was to avoid certain abuses that had been or were supposed to have been practiced by former legislatures in enacting city charters by special laws and obviously the purpose of the adoption of Article IV, section 1a, was to confer upon the municipalities and districts the same initiative and referendum powers in respect to their local, special and municipal legislation that had previously been reserved to the people of the state, by Article IV, section 1, in respect to all

general matters of legislation. Whatever the purpose, these amendments have been the source of more litigation and have caused a greater diversity of opinion as to the scope and meaning to be given them than perhaps any other number of laws which have ever been adopted or enacted in this state. Speaking of Article XI, section 2, McBain in his Law and Practice of Municipal Home Rule, p. 592, says:

"On the very face of its recitals this constitutional provision is pregnant with ambiguities and omissions. In the first place, it appears to provide no means whatever by which a new municipal corporation may be brought into existence. It is scarcely to be imagined that the people of any unorganized community could of their own action and without regard to any legal forms or fixed procedure organize themselves into an incorporated city. Yet in the second sentence of the section it is expressly declared that 'the legislative assembly shall not enact * * * any * * * act of incorporation for any municipality.' This restriction is not qualified by the word 'special'. Surely a general law is none the less, by reason of its generality, 'an act of incorporation', for a city which becomes organized under its provisions. Literally construed this provision would seem to prohibit the Oregon legislature from enacting even a general act for the incorporation of new cities."

Speaking of these amendments and of the difficulties which this court had encountered in their interpretation, as well as of the conflicting opinions that had been rendered by this court in respect to the meaning of the amendments, this court, in *Rose v. Port of Portland,* 82 Or. 541 (162 P. 498), said:

"* * * The amendments were innovations at the time of their adoption and their newness made it difficult to understand their full scope and meaning; what was then theory has since become practice, and

what to some may once have appeared apocryphal has now become familiar and accepted usage, so that now the language of the amendments is shown in the clearer light of practical experience, rendering it less difficult to interpret the amendments and enabling all readers to see plainly what was then clear to the writers of these changes in the Constitution.''

Prior to the decision in *Rose v. Port of Portland*, in attempting to determine the meaning of these amendments, there were two lines of decisions entirely inconsistent with each other. In one line of cases, the court was of the opinion that the amendments should be given a literal construction, while in the other line of cases a closer analysis seems to have been made and a different result was reached. In one respect, however, all our decisions are in entire accord. It has been consistently held that, in so far as these two amendments relate to the same subject matter, they should be read together and be so interpreted as to carry out the purpose of the people in adopting them: *Acme Dairy Co. v. Astoria,* 49 Or. 520 (90 P. 153) ; *McKenna v. City of Portland,* 52 Or. 191 (96 P. 552) ; *Farrell v. Port of Portland,* 52 Or. 582 (98 P. 145) ; *Branch v. Albee,* 71 Or. 188 (142 P. 598) ; *Rose v. Port of Portland,* supra.

Prior to *Straw v. Harris,* 54 Or. 424 (103 P. 777), the literal meaning was given to the language of the amendments. In this latter case, Mr. Justice KING, speaking for the court, laid down what we believe to be the true meaning of these amendments. Among other things, he said:

"* * * and whatever may be the literal import of the amendments it cannot be held that the State has surrendered its sovereignty to the municipalities to the extent that it must be deemed to have perpetually

lost control over them. This no State can do. The logical sequence of a judicial interpretation to such effect would amount to a recognition of a state's independent right of dissolution. It would but lead to sovereigntial suicide. It would result in the creation of states within the state, and eventually in the surrender of all state sovereignty—all of which is expressly inhibited by Article IV, sec. 3 of our national constitution. Power to enact local legislation may be delegated, but this of necessity, whether stated or not, is always limited to matters consonant with, and germane to, the general purpose and object of the municipalities to which such prerogatives may be granted.

"Municipalities are but mere departments or agencies of the State, charged with the performance of duties for and on its behalf, and subject always to its control. The State, therefore, regardless of any declarations in its constitution to the contrary, may at any time revise, amend, or even repeal any or all of the charters within it, subject, of course, to vested rights and limitations otherwise provided by our fundamental laws. This, under the constitution as it now stands, may be done by the legislature through general laws only, and the same authority may be invoked by the people through the initiative by either general or special enactments; only the legislature being inhibited from adopting the latter method."

The doctrine of *Straw v. Harris* was later followed and approved in *McMinnville v. Howenstine,* 56 Or. 451 (109 P. 81, Ann. Cas. 1912C, 193); *Kiernan v. Portland,* 57 Or. 454 (111 P. 379, 112 P. 402, 37 L. R. A. (N. S.) 339); *State ex rel. v. Port of Tillamook,* 62 Or. 332 (124 P. 637, Ann. Cas. 1914C, 483); *State ex inf. v. Gilbert,* 66 Or. 434 (134 P. 1038), and in *Churchill v. Grants Pass,* 70 Or. 283 (141 P. 164), where the court said:

"This delegation of rights as to local self-government does not alter the relation of municipal corpo-

rations to the state, but leaves them, as they were before, mere agencies of the state, which may by general laws control all its municipalities even to the extent of amending their charters.''

Although the case last cited was decided on April 28, 1914, and announced the doctrine that the state may, by general laws, control all its municipalities even to the extent of amending their charters, the court, on June 16, 1914, in *Branch v. Albee,* supra, with but two members dissenting and without even referring to the Churchill case, or overruling any of its former decisions, held that:

''The conclusion seems to be irresistible that the people, by the adoption of said amendment, intended to withdraw from the legislative assembly all power that it previously possessed to enact, amend, or repeal charters or acts incorporating cities or towns, and to confer upon the legal voters of cities and towns all of said power, except the power to repeal charters. If effect is given to the language of this amendment, no other conclusion appears to be tenable.''

Later, in *Kalich v. Knapp,* 73 Or. 558 (142 P. 594, 145 P. 22, Ann. Cas. 1916E, 1051), the court followed the reasoning in *Branch v. Albee,* supra. The question for decision in that case was whether a general statute of the state regulating the speed of motor vehicles superseded certain ordinances of the city of Portland, and the decision was made to depend on whether the legislature had power to amend, annul or repeal a city charter. In deciding that case, the court considered *Straw v. Harris,* supra, and, without overruling it, criticized some of the statements made as ''gratuitous observations unnecessary of consideration in a decision of the points involved''. The court further said:

''* * * It is true that the court in that decision said, in substance, 'that the state cannot surrender its

sovereignty to the municipalities'. This the state has not done by circumscribing the power of the legislature over municipal charters, as the sovereignty in this state resides in the people. They have retained unto themselves, under the initiative and referendum provision of the Constitution, power to create, amend, or annul a municipal charter, though denying that privilege to their representatives through which they commonly speak.''

And so it was held in that case that a general law applicable alike to all cities, regulating the speed of automobile traffic and which, in effect, was a criminal statute, was unconstitutional in so far as it was in conflict with an ordinance of the city of Portland and this, notwithstanding that the charter of the city of Portland, by its own terms, made its provisions subject to the general laws of the state. Following this and holding to the same effect was *Pearce v. Roseburg*, 77 Or. 195 (150 P. 855). One of the points at issue was whether the city of Roseburg, under an express authority conferred by its charter, had the power to issue bonds for the construction of a railroad from the city to a point on the North Umpqua river at its intersection with the western boundary of the Cascade Range Forest Reserve. *Pearce v. Roseburg* was a suit brought by a taxpayer to enjoin the city from contracting for the construction of the railroad and from issuing bonds to finance such construction upon the ground that the incurring of such indebtedness would be in direct violation of chapter 159, Laws 1915, which prohibited the city from levying taxes in excess of the amount levied during the two years next preceding plus 6 per cent. In holding that the city had such power, this court, speaking through Mr. Justice Mc-

BRIDE, who had dissented in *Kalich v. Knapp* and *Branch v. Albee,* supra, said:

"* * * City taxation is entirely a local matter with which the people of the state at large have no concern. The writer, while still adhering to the dissenting opinions expressed in Kalich v. Knapp, 73 Or. 558, 145 P. 22; and Branch v. Albee, 71 Or. 188, 142 P. 598, considers it is settled in this state that as to matters purely municipal the state legislature cannot intermeddle by either general or special legislation, although as to matters affecting the people generally the power of the legislature is still unlimited, and the latter proposition cannot be maintained unless this court shall materially modify its holding in Kalich v. Knapp."

■ It will thus be seen that up to the time of the decision in *Pearce v. Roseburg,* the court had taken no settled view as to the scope and meaning of these two constitutional amendments. In one line of decisions, the court had held that a charter or ordinance of the city in conflict with a general law applicable throughout the state was paramount over such general law because beyond the power of the legislature to enact it. In another line of decisions, the court had held that the state statute was paramount and controlling over all charters and ordinances in conflict therewith. This controversy was not finally settled until the decisions in *State ex rel. v. Port of Astoria,* 79 Or. 1 (154 P. 399); *Rose v. Port of Portland,* supra, and *Lovejoy v. Portland,* 95 Or. 459 (188 P. 207), were rendered, when it became finally settled that a statute of general application throughout the state would supersede the provision of any charter or any ordinance in conflict therewith. In the Rose case, where the question was exhaustively considered by Mr. Justice

HARRIS, it was held, with the entire concurrence of all the members of the court, that:

"* * * The legislature has the right to pass a general law concerning municipalities, cities and towns; the right is contained in the Constitution; and therefore when the legal voters of a city or town enact or amend a charter they do so subject to the right of the legislature to pass a general law because their right to enact or amend their charter must be exercised 'subject to the Constitution'."

Since that decision, all later cases have approved that ruling and it is now settled that, within the limits prescribed by the other provisions of the state constitution and of the federal constitution, the power of the legislature to enact a general law applicable alike to all cities is paramount and supreme over any conflicting charter provision or ordinance of any municipality, city or town. Holding to this effect are the following cases: *Colby v. City of Medford,* 85 Or. 485 (167 P. 487); *Portland v. Public Service Commission,* 89 Or. 325 (173 P. 1178); *Lovejoy v. Portland,* supra; *Hillsboro v. Public Service Commission,* 97 Or. 320 (187 P. 617; 192 P. 390); *Tichner v. Portland,* 101 Or. 294 (200 P. 466); *Hofer v. Carson,* 102 Or. 545 (203 P. 323); *Parker v. City of Silverton,* 109 Or. 298 (220 P. 139, 31 A. L. R. 589); *State ex rel. v. Slusher,* 119 Or. 141 (248 P. 358); *In re Application of Boalt,* 123 Or. 1 (260 P. 1004); *City of Gearhart v. Gearhart Park Co.,* 132 Or. 496 (286 P. 147); *Portland Baseball Club v. Portland,* 142 Or. 13 (18 P. (2d) 811); *Pederson v. Portland,* 144 Or. 437 (24 P. (2d) 1031); *City of Klamath Falls v. Oregon Liquor Control Comm.,* 146 Or. 83 (29 P. (2d) 564). See also *Cal.-Ore. Power Co. v. City of Grants Pass,* 203 Fed. 173; *Portland Railway, L. & P. Co. v. City of Portland,* 210 Fed. 667; *City of*

*Portland v. Pac. T. & T. Co.,* 5 Fed. Supp. 79. In the first two of the federal cases just cited, the decision was by Judge Robert S. Bean, a former justice of this court. In the second case, he said:

"*   *   * It is true that under the Oregon system the legal voters of every city or town are given power to enact and amend their municipal charter, subject to the Constitution and criminal laws of the state. But this does not authorize the people of a city to amend its charter so as to confer upon the municipality powers beyond what are purely municipal or inconsistent with a general law of the state constitutionally enacted."

That these amendatory provisions were intended to mean what these later decisions all hold seems clear. As said by McGoldrick in Law and Practice of Municipal Home Rule, 1916-1930, p. 164:

"The limitations upon the power of the legislature relate to the manner of legislation and not to the subject matter. There is certainly no express limitation designed to reserve to cities a sphere of autonomy. If such is to be found, it must be implied from the fact that cities are granted power to make and amend their municipal charters. It would be equally logical to hold that, though cities are protected from all special legislation, they are subject to all general legislation. This would accord with the explicit intent of the two latest states to grant municipal home rule, and if the term 'general law' were not abused in practice, it would afford to cities a very substantial protection against legislative interference."

The chief difficulty in interpreting these amendments has resulted from the particular language used in the second sentence of Article XI, section 2, which reads: "The legislative assembly shall not enact, amend or repeal, any charter or act of incorporation for any municipality, city or town." The late Mr. Chief Justice McBride, who was one of the framers of that

amendment and who presumably knew the meaning it was intended to have, said in his dissenting opinion in *Kalich v. Knapp*, supra:

"The language employed seems to me clearly to indicate a purpose to prohibit special and local legislation affecting city charters. It provides that the legislature shall 'not enact, amend, or repeal any charter or act of incorporation of any municipality, city, or town'—using the singular number, whereas if it had been the intent to prohibit general legislation affecting all towns and cities the plural would naturally have been employed."

He might have added that, if, by that sentence, it had been intended to prohibit the legislature from enacting, amending or repealing the charter of any municipality, it could have easily indicated that intention by merely adding the words "by any general law", and this would have avoided much of the uncertainty and doubt with which this court has been so much concerned.

■ It is said arguendo that the refunding of these water bonds by the city of Reedsport is purely a matter of local concern and, for that reason, the recital in the opinion in *Pearce v. Roseburg* that "city taxation is entirely a local matter with which the people of the state at large have no concern" should be followed in the instant case. Even if it were true that city taxation is of no concern except to the people who reside in the city, it could not affect the result of this case since the entire matter in controversy is controlled by a general statute applicable alike to all cities. But how can it be contended that local taxation is wholly of no concern to those who reside outside of the taxing district? From the very inception of our state government to the present moment, our constitution has con-

tained numerous provisions regulating and controlling local taxation and local indebtedness which would not be true if those matters had not been of concern to the people of the state generally.

The records of our various state departments show that many municipalities in this state have exercised the authority conferred by this general statute in refunding their outstanding matured bonds by issuing other bonds pursuant to the act. These refunding bonds have been disposed of and many of them are now owned by certain of the state departments, by various trust companies within the state, and by the investing public. Their validity, therefore, is a matter of general concern. It was within the power of the legislature to enact this law and its effect has been to supersede or amend every charter or municipal ordinance with which it is in conflict.

From these considerations it follows that a peremptory writ must issue, and it is so ordered.

BELT and BEAN, JJ., not sitting.