Argued and submitted June 5, 1984, reversed and remanded July 2, 1985

STATE OF OREGON, Acting by
and through the DIRECTOR OF
VETERANS' AFFAIRS,
*Respondent on Review,*

*v.*

VICKERY et al,
*Defendants,*
CITY OF PORTLAND,
*Petitioner on Review.*

(A8204-0220; CA A28081; SC S30456)

702 P2d 1070

Nancy E. Ayres, Portland, argued the cause and filed the briefs for petitioner on review.

William F. Nessly, Jr., Assistant Attorney General, Salem, argued the cause and filed the brief for respondent on review. With him on the brief was Dave Frohnmayer, Attorney General, and James E. Mountain, Jr., Solicitor General, Salem.

CAMPBELL, J.

---

* Appeal from judgment of Circuit Court for Multnomah County. Charles S. Crookham, Judge. 66 Or App 752, 675 P2d 519 (1984).

## CAMPBELL, J.

We allowed review in this case to determine the priority between a City of Portland (City) nuisance abatement assessment lien, under a city charter which states that municipal assessment liens shall have priority over all other liens and encumbrances, and a prior recorded mortgage in favor of the Department of Veterans' Affairs (DVA). We hold that the City's lien has priority and reverse the Court of Appeals.

In May of 1979, defendants David and Joan Vickery purchased a house and lot within the city limits of Portland. To finance the purchase, the Vickerys entered into a mortgage agreement with plaintiff, DVA. The mortgage was properly recorded May 30, 1979.

By September of 1981, the Vickerys had accumulated, in violation of the Portland City Code,[1] a collection of old tires, appliances and debris in their yard. Pursuant to municipal code, City posted a notice on the property directing the Vickerys to remove the collection from their yard.[2] The

---

[1] Portland City Code 18.03.050 reads in pertinent part:

"(a) The owner of any real property, improved or unimproved, shall, in reference to the property and the half of the street or streets abutting the property; (1) Cut and remove and keep cut and removed therefrom all weeds, and other noxious vegetation and all grass more than ten (10) inches in height.

"(2) Remove and keep removed therefrom all dead bushes, dead trees, stumps, junk, dead organic matter, debris, garbage, offal, rat harborages, stagnant water, combustible materials, and waste materials.

"* * * * *

"(c) All conditions in violation of this section shall constitute a nuisance. Summary abatement of such nuisances is authorized. Any person whose duty it is to correct such conditions and who fails to do so shall be subject to the penalties provided for by this code."

[2] Portland City Code 18.03.010 reads:

"(a) Whenever it is declared by ordinance that anything is a nuisance and the Director, Bureau of Buildings, has knowledge that such nuisance exists, unless the ordinance authorizes summary abatement, the Bureau of Buildings shall post upon the property liable for the abatement of the nuisance a notice directing the removal of the nuisance."

The notice posted on the Vickerys' property read in part:

"In case of failure to remove the nuisance within the time set forth above, the City of Portland will cause the nuisance to be abated and charge the cost of abatement, plus overhead and a civil penalty in the amount of $80.00, against the property described above."

Vickerys failed to remove the nuisance and defendant City, pursuant to the municipal code, hired a contractor to do the necessary cleanup. The city council assessed the cost of abating this nuisance against the property. This assessment was a tax levied and lien against the property when it was entered into the city lien docket in April 1982.[3]

The Vickerys were delinquent on their DVA mortgage and in April 1982, DVA filed the complaint in this case to foreclose its mortgage and named City as a defendant. As a part of its complaint, DVA asked to have the court declare its mortgage as the first and paramount lien on the property. City answered denying that DVA's interest in the property had priority and asserted that its nuisance abatement lien, even though not bonded under the Bancroft Bonding Act, ORS 223.205 to 223.295, was superior.

The trial court held that DVA's mortgage had first priority by virtue of its earlier recording time. Following the foreclosure judgment and decree, City appealed. The Court of Appeals affirmed without opinion. 66 Or App 752, 675 P2d 519 (1984).

■    The issue is simply stated. Did the trial court and Court of Appeals err in determining that DVA's mortgage lien had priority over City's nuisance abatement lien? The parties agree that as a general rule of law, first in time is first in right.

---

[3] Portland City Code Section 18.03.035 details how the cost of abatement becomes a lien upon the property:

"(a) Upon receipt of the statement, the auditor shall forthwith mail to the owner of the property therein mentioned a notice setting forth the amounts set forth in the statement and stating that the Council proposes to assess against the property the amounts set forth and that objections to the proposed assessment may be made in writing and filed with the auditor on or before twenty (20) days from the date of mailing such notice.

"* * * * *

"(c) Upon the conclusion of administrative review, or on the expiration of the twenty-day period, if no objections have been received, the matter of the proposed assessment shall be determined by the Council in the regular course of business. * * * As assessment for such costs, penalties, and overhead expenses, or so much thereof as the Council determines is proper shall be made by ordinance and shall be entered in the docket of city liens, and upon such entry the same shall constitute a lien upon the property from which the nuisance was removed and abated, which lien shall be collected in all respects as provided for street improvement liens, and shall bear interest at the legal rate as set by state law from ten (10) days after the date of entry in the lien docket. * * *"

However, this rule is subject to legislative action that restructures the normal priorities.[4]

City argues that its charter provision Section 9-803[5] and ORS 223.230[6] grant priority to its lien; that the priority of assessments is consistent with general legislative intent to make assessment liens superior to all other liens because of their tax-like nature; and that the intent to make assessments superior to mortgages can be implied from the nature and purpose of the assessments.

DVA answers by arguing that no statute gives this type of unbonded lien priority.[7] DVA concedes that City's charter provisions and ordinances attempt to do so, but argues this attempt must fail for two reasons: (1) the status of the Oregon War Veterans' Fund[8] as a constitutionally dedicated fund and (2) that at common law, state liens have priority over other liens.

As a starting point, we examine DVA's claim that the Oregon Constitution gives priority to its mortgage interest.

Thie pertinent part of Article XI-A, section 1, of the Oregon Constitution reads as follows:

"Notwithstanding the limits contained in section 7, article XI of the Constitution, the credit of the State of Oregon may be loaned and indebtedness incurred. * * * for the purpose of

---

[4] Examples would be statutory priorities for property taxes, improvement liens that have been Bancrofted (bonded assessments for improvements under ORS 223.205 to 223.295), and various mechanics and labor liens.

[5] *Infra* at page 6.

[6] ORS 223.230 is part of the Bancroft Bonding Act which is codified as ORS 223.205 to 223.295. *See* note 7, *infra*.

[7] ORS 407.135 allows the director of DVA "to pay taxes, liens, and charges of every kind superior to the lien of the state." The director claims this statute as his authority to pay such liens as property tax liens, which have priority under ORS 311.405(7)(a) and bonded assessments for improvements under the Bancroft Bonding Act, ORS 223.205 to 223.295. DVA argues that because the nuisance abatement lien was not subject to bonding, the Bancroft Act does not apply. City argues that ORS 223.230 grants priority to its lien even though not bonded. We do not reach this issue because the charter provisions dispose of the priority issue in this case.

Both parties agree that if the nuisance abatement assessment were considered a local improvement, ORS 223.387, and bonded under ORS 223.205 to ORS 223.295, then the lien would have priority over the DVA mortgage.

[8] ORS 407.495 provides for a special fund "to be known as the Oregon War Veterans' Fund."

creating a fund, to be known as the 'Oregon War Veterans' Fund' to be advanced for the acquisition of farms and homes for the benefit of male and female residents of the State of Oregon who served in the Armed Forces of the United States. Secured repayment thereof shall be and is a prerequisite to the advancement of money from such fund, * * *."

■ This constitutional provision is clear. The constitutional language restricts the power of the Director of Veterans' Affairs to make loans and disburse money. Before the director can advance money for farm or home loans, there must be security for the repayment of the funds disbursed. The above constitutional provision did not create an "irreducible fund."[9] The legislature has interpreted the constitutional language to require no more than a first lien. ORS 407.225 defines "secured repayment" to mean "either a first lien or a lien insured by mortgagee's title insurance against loss from any prior encumbrance." This prerequisite was met when the Vickerys gave DVA a first mortgage to the premises as a condition to the advancement of money.

■ DVA asserts that this constitutional language not only makes "secured repayment" a prerequisite to the "advancement of money" but also gives DVA first priority to the proceeds of a foreclosure sale of the secured property despite City's charter and ordinance provisions to the contrary. We disagree. The protection afforded the fund by the constitution is that the advancement of money from the fund shall be secured. Advancement of money has an everyday meaning. In a loan situation, the funds are advanced when the loan is made. This is the time addressed by the constitutional provision, and a first mortgage satisfies the constitutional protection afforded the advanced funds.[10] Also, there is no

---

[9] If the drafters of the constitutional provision creating the Oregon War Veterans' Fund wanted to create an irreducible fund, they could have worded the amendment to so provide. An example would be the original Article VIII, section 2, of the Oregon Constitution which created an "irreducible school fund" that was not subject to subsequent liens generally given statutory priority. See *State Land Board v. Schroetlin*, 161 Or 146, 149, 88 P2d 316 (1939); *Eagle Point Irr. Dist. v. Cowden, et al*, 137 Or 121, 124, 1 P2d 605 (1931).

[10] The 1944 Voters' Pamphlet explained the constitutional amendment authorizing the Oregon War Veterans' Fund as follows:

"AMENDMENT AUTHORIZING 'OREGON WAR VETERANS' FUND, PROVIDING TAX THEREFORE—Purpose: Empowering the state to incur indebtedness not exceeding 3 per cent of the assessed valuation of all property

indication that the legislature in passing ORS 407.225 intended other than a standard mortgage transaction with the normal protections and priorities. That is, although a mortgage may be a first lien at its inception, it is subject to being displaced by subsequent liens that are given statutory priority.

We now turn to the DVA's second argument that the common law protects the state's interest. At common law the state has priority over other creditors in the collection of debts owned to it. *United States F. & G. Co. v. Bramwell,* 108 Or 261, 269, 217 P 332 (1923); *Withers, et al v. Reed,* 194 Or 541, 547, 243 P2d 283 (1951). The Oregon War Veterans' Fund is held and administered by the State. Therefore, unless contrary legislation gives City's lien priority, DVA would have common law priority.

The City of Portland was incorporated by an act of the legislature in 1903. Special Laws of Oregon, 1903, pages 3-178. Section 73(1) and (2) of that charter read as follows:

"Section 73. The council has power and authority, subject to the provisions, limitations, and restrictions in this charter contained—

"1.   To exercise within the limits of the City of Portland all the powers, commonly known as the police power, to the same extent as the State of Oregon has or could exercise said power within said limits;

"2.   To make and enforce within the limits of the city all necessary water, local, police, and sanitary laws and regulations."

These provisions have been recodified[11] and the charter now reads:

Section 2-105:

therein to raise money to be loaned on security of farms and homes to be acquired by residents who have served honorably in the army, navy, marine corps, or any auxilary thereof, for at least 90 days after September 1, 1940, and before the end of actual hostilities with any of the Axis powers; levying a 2 mill additional tax outside 6 per cent limitation upon property for the payment of principal and interest on bonds issued to create such fund.          Vote YES or NO"

[11] The effect of recodification by a city of its statutory charter was not briefed or argued by either party. For this case we follow the general rule that a statute which is a recodification rather than a new enactment must be construed as a continuation of the existing statute. *Perkins Mfg. Co. v. Clinton Const. Co.,* 211 Cal 228, 295 P 1, 75 ALR 439 (1931); *see also* 82 CJS States § 276 (1953), and cases cited therein.

"(a)    Among such specific powers, the City has power and authority:

"1.    To exercise within the City and City-owned property, all the powers commonly known as the police power to the same extent as the State of Oregon has or could exercise said power within said areas, and to make and enforce within said areas all necessary or appropriate water, local, police, sanitary and safety laws and regulations."

Subsection 44 of Section 2-105(a) of the current charter provides:

"To prevent and remove nuisances, to declare what shall constitute the same, to punish persons committing or suffering nuisances, to provide the manner of removal of nuisances, and to make the cost of such removal a lien upon the property where such nuisances existed; and to fill up or drain any lots, blocks or parcels of land subject to flood or where any stagnant water stands, to declare the same a nuisance, and to make the cost of filling up or draining the same a lien upon the property so filled or drained. Liens for abatement of nuisances may upon the order of the Council be entered in the docket of city liens and thereafter [collected in the same manner as assessments for street improvements or may be] collected in such manner as the Council may direct."

(Formerly section 73 (26) of the 1903 Charter. The 1903 Charter was the same except that it contained the bracketed language.)

The 1903 charter, section 407 with respect to street assessments provided:

"The Docket of city liens is a public writing, and from the date of the entry therein of an assessment, the sum as entered is hereby declared to be a tax levied and a lien upon such lot, part thereof, or tract of land, which lien shall have priority over all other liens and encumbrances whatsoever thereon, and the sum or sums of money assessed for any local improvement, entered upon such lien docket, shall be due and payable from the date of such entry, and if not paid or bonded, as provided by law, within ten days from the date of such entry, thereafter the same shall be deemed to be delinquent and shall bear interest at the legal rate."

That authority for lien priority has been recodified and is now found in the City's charter in Section 9-803.

"Section 9-803. Assessment Lien; Payment. The docket of

City liens is a public writing, and from the date of entry therein of an assessment, the sum entered is a tax levied and a lien upon the land against which it is entered. Assessment liens shall have priority over all other liens and encumbrances."

Whether a city charter and ordinances can alter common law was answered in *Covey Garage v. Portland,* 157 Or 117, 139, 70 P2d 566 (1937). The court stated:

"Our Constitution (Art. XVIII, § 7) provides:

" 'All laws in force in the Territory of Oregon when this Constitution takes effect, and consistent therewith, shall continue in force until altered or repealed.'

"We observe that such laws remain in force only until 'altered or repealed.' They may be altered or repealed: *Stewart v. Houk,* 127 Or. 589 (271 P. 998, 272 P. 893, 61 ALR 1236), *Perozzi v. Ganiere,* 149 Or 330 (40 P2d 1009). It will be recalled that Portland's charter grants it power to exercise the police power 'to the same extent as the State of Oregon has or could exercise said power within said limits.' Valid ordinances have the same effect in the city as the general laws of the state: *Portland v. State Bank of Portland,* 107 Or. 267 (214 P. 813). The enactment of an ordinance or of a statute—unless they be merely codifications of existing regulations—necessarily alters the existing law. * * * In other words, the enactment of the ordinance affects the common law by prescribing a different standard of conduct."

The Legislature of the State of Oregon, in granting a charter to the City of Portland, legislated a priority different from the common law priority.

■ The "Home Rule" amendments[12] when they were enacted in 1906 did not change the laws or charters of the cities. They gave the cities the authority to enact or amend their own charters, *Branch v. Albee,* 71 Or 188, 198, 142 P 598 (1914). "Home Rule" is not an issue in this case, because the pertinent parts of Portland's Charter were not enacted under "Home Rule" provisions.

---

[12] As explained in *LaGrande/Astoria v. PERB,* 281 Or 137, 140, 576 P2d 1204 (1978), "Home Rule" is not a constitutional term but is a concept that arises from two provisions of the Oregon Constitution that together provide for "home rule" or local control of local concerns in certain matters. The basis of "Home Rule" is found in Article XI, section 2, and Article IV, section 1(5).

■ As mentioned earlier, the State has enacted general statutes giving the cities lien priorities in certain instances. In the special legislation that created the Portland City Charter, the legislature specifically authorized that nuisance abatement liens would have priority over all other encumbrances. The legislature has not changed that priority by passing a general law giving DVA mortgages priority over municipal liens.

We hold that City's lien has priority over the DVA's mortgage claim on the foreclosed property.

The decision of the Court of Appeals is reversed. This case is remanded to the trial court for entry of a judgment consistent with this opinion.