# DEPARTMENT OF REVENUE *v.*
# COUNTY OF MULTNOMAH

134

Ira W. Jones, Assistant Attorney General, submitted briefs for plaintiff.

Willis A. West, Chief Civil Deputy, Multnomah County, submitted briefs for defendant.

Decision for plaintiff rendered September 9, 1970.

Appeal dismissed, September 30, 1970.

CARLISLE B. ROBERTS, Judge.

This suit was brought by the plaintiff to require the defendant, a charter county, to amend its notice of tax levy for the fiscal year 1970-71 to conform to the plaintiff's interpretation of Or L 1969, ch 45, § 8. Three principal issues are presented by the pleadings.

I

Was the plaintiff's complaint timely filed in the Oregon Tax Court within the 20-day limitation of ORS 294.485?

ORS 294.485, as pertinent herein, reads:

"(1) Any tax levy made contrary to * * * law relating to the making of tax levies shall be voidable as provided in subsection (2) of this section * * *.

"(2) * * * the Department of Revenue, * * * may appeal to the Oregon Tax Court and such appeal shall be perfected in the following manner only:

"(a) Within 20 days after the notice of tax levy is filed with the county assessor, the appealing party shall file an original and two certified copies of a complaint with the clerk of the Oregon Tax Court at its principal office in the state capital, Salem, Oregon. Such filing in the Oregon Tax Court shall constitute the perfection of the appeal. * * *"

Multnomah County's Home Rule Charter (defendant's Exhibit A) became effective generally on January 1, 1967. The powers of the county "not vested by the charter elsewhere" are vested in a Board of County Commissioners, with discretion to delegate such powers. Charter, § 2.20. The Chairman of the Board of County Commissioners is the chief executive who may appoint and discharge administrative officers and

employees of the county, "except that his appointment of department heads shall be with the board's approval; * * *." The chairman "may delegate his administrative powers but shall retain full responsibility for the acts of his subordinates."

Multnomah County Ordinance No. 2, dated January 3, 1967 (defendant's Exhibit E), placed in operation a "Department of Finance," giving to it the functions prescribed by state law for the assessor and the sheriff as tax collector, but providing that the functions of the department "shall be considered vested in the Chairman of the Board of County Commissioners * * *." Multnomah County Ordinance No. 23 (defendant's Exhibit G), amended Multnomah County Ordinance No. 2, to change the name of "Department of Finance" to "Department of Assessment and Taxation," effective April 14, 1969, and to provide that the Director thereof shall have the title of "Assessor and Tax Collector." However, the duties of assessor, as prescribed by state law, were perpetuated by the ordinances, thus conforming to Oregon Constitution, Art. VI, § 10.

The "Order of the Multnomah Board of County Commissioners Levying Taxes on the 1970-71 Tax and Assessment Roll," dated June 25, 1970 (defendant's Exhibit C), recites the need for $24,396,570 to meet the approved budget and such sum "is hereby levied." This notice of tax levied "within" and "without" the six percent limitation was certified to the Multnomah County Assessor and Tax Collector on June 30, 1970.

■■ The defendant contends that the execution by the Board of the order of June 25, 1970 (defendant's Exhibit C), determines the date "within 20 days after the notice of tax levy is filed with the county assessor," inasmuch as the Chairman of the Board of County

Commissioners (one of those signing the order) had the statutory responsibility under Ordinance No. 2 to effect the levy of taxes, although the administrative functions necessary to carry out this responsibility had been delegated to the Department of Assessment and Taxation, pursuant to Ordinance No. 23, effective April 14, 1969. Plaintiff contends that the 20-day period referred to in ORS 294.485(2)(a) should run from the time of the filing of the notice of levy with the Director of the Department of Assessment and Taxation, who received it on June 30, 1970.

ORS 306.005 reads in part:

> "As used in the laws of this state relating to the assessment, levy, collection and review of ad valorem taxes, unless the context otherwise requires:
>
> "(1) 'Assessor' includes, in a county having a county charter, the individual or officer *performing* thereunder the duties imposed upon assessors with respect to ad valorem taxes by the laws of this state." (Emphasis added.)

The word "performing" is regularly used to indicate the person actually doing the work himself, as distinguished from the employer, contractor, or similar person legally responsible to see that the undertaking is completed. Standard dictionary definitions stress the "doer" as the "performer," not the person who commands the performance. In construing the word "performing" as used in a legislative act, an English case has best expressed the consensus that it "means actually doing the work himself; and, if a person is not hired to do the work himself, the fact of his being employed in contracting only to get it done does not make him an artificer, within the meaning of the act." *Sharman v. Sanders*, 16 Eng Law & Eq 431, 436. See 32 Words and Phrases 48.

■ The customary duties of the county assessor are detailed in ORS chapter 308. The assessor is bound by law to search out all the taxable property in the county and to list the same on an assessment roll, describing it in detail (see ORS 308.215), placing an appraised value thereon in conformity with law, listing the property in code areas to meet the requirements of various local taxing districts, and extending the roll by applying the levies of the several taxing districts. These details are made complex by reason of various exemptions or partial exemptions, requirements of time, and provisions for appeal. It seems clear that the statutory definition found in ORS 306.005, in the case of Multnomah County, applies only to the officer designated as "Director of Assessment and Taxation," rather than to the Chairman of the Board of County Commissioners, and the court so finds. It follows that the complaint was timely filed.

## II

Does Or L 1969, ch 45, § 8, apply to charter counties?

The plaintiff seeks to enforce a "law relating to the making of tax levies" as permitted by ORS 294.485. The statute referred to is Or L 1969, ch 45, § 8, which, in pertinent part, reads as follows:

> "For each of the fiscal years 1969-1970, 1970-71 and 1971-72, * * * a county shall not levy within its tax base more than an amount equal to its base for the year, reduced by subtracting an amount equal to the amount the county levied in 1967 for public assistance purposes as required under ORS 411.170 or 411.180. * * *"

The act, effective July 1, 1969, was chiefly designed to relieve the counties of the burden of contributing to

public assistance administered by the State Public Welfare Commission. It is apparent, however, that § 8, quoted above, has no bearing upon public assistance; it imposes a limitation upon the county's power to levy taxes for a period of three consecutive years, beginning with the tax year 1969-1970. Does the Legislative Assembly have the power to impose such a restriction upon a charter county?

The Oregon Constitution, Art VI, § 10, gives authority to the Legislative Assembly to provide by law a method whereby the legal voters of any county may adopt, amend, revise or repeal a county charter. "A county charter may provide for the exercise by the county of authority over matters of county concern." The measure has been implemented by provisions for county home rule, ORS 203.710 to 203.810.

The constitutional provision and the enacting legislation relating to charter counties appear not to have been construed by the courts. On the other hand, the constitutional provisions for the establishment of home rule in cities and towns have been the subject of substantial litigation. (See *Burton v. Gibbons*, 148 Or 370, 36 P2d 786 (1934); *State ex rel Heinig v. Milwaukie et al*, 231 Or 473, 373 P2d 680 (1962).) It can now be asserted as a rule that whether or not legislation enacted by the Legislative Assembly is binding upon a charter city or town will depend upon whether the matter is one of paramount municipal concern or is of paramount statewide concern. *State ex rel Heinig v. Milwaukie et al, supra,* pp 481-482.

■ The provisions of the Oregon Constitution, Art IV, § 1, and Art XI, §§ 2 and 5, relating to municipal charters, do not repeat the language of Oregon Con-

stitution, Art VI, § 10, respecting county home rule. Therefore, it is possible that the Legislative Assembly will be found to have retained greater authority over the counties, traditionally agents of the state, than it is able to exercise over the cities, but this need not be decided in the present case. (*City of Pendleton v. Umatilla County*, 117 Or 140, 150, 241 P 979 (1926); *Highway Com. v. Clackamas W. Dist.*, 247 Or 216, 220, 428 P2d 395 (1967).). But, as stated above, the problems arising between the cities and the state have turned upon whether or not the matter in question was one of paramount local or paramount statewide concern. Undoubtedly, the language of Oregon Constitution, Art VI, § 10, reflects this legislative and judicial history: "A county charter may provide for the exercise by the county of authority over *matters of county concern.*" (Emphasis added.) While cities and counties are substantially different in many respects, it is reasonable to conclude that the criteria established by the courts to distinguish between matters of local concern and matters of statewide concern will generally be applicable to counties as well as to cities. (See Etter, *County Home Rule in Oregon*, 46 Or L Rev 251 at pp. 264-265.)

The difficulty of determining what is of local concern and what is of statewide concern and the lack of harmony in the earlier decisions is reviewed in *State ex rel Heinig v. Milwaukie et al, supra.* On page 481, the court quotes McDonald, *American City Government and Administration*, p 79 (3d ed 1941):

> " 'The real test is not whether the state or the city has an interest in the matter, for usually they both have, but whether the state's interest or that of the city is paramount.' "

On page 488, the court states the rule:

"* * * Each case requires the weighing of the state's interest against the interest of the municipality. In some instances the need for uniformity, or the benefit of a widespread application of the law, or the recognition that the matter dealt with is interrelated with other functions of the state and similar considerations will require that the statute have preference over the charter; on the other hand the charter will prevail when the advantages of local autonomy are paramount."

McQuillan, *Municipal Corporations* (2d ed), § 93, p 273, states:

"The purpose [referring to the home rule amendments] was to give local communities full power in matters of local concern, that is, in those matters which peculiarly affected the inhabitants of the locality, not in common with the inhabitants of the whole state. Those matters which affected all of the inhabitants of the state were viewed as state matters, and therefore subject to state control, but those things which did not concern inhabitants of the state other than those residing in the particular community, were sought to be differentiated as local concerns, which under these constitutional provisions were to be regarded as exclusively matters of local self-government, or home rule for control alone by the local inhabitants in any manner which seemed to them desirable, not inconsistent with the general laws and policy of the state."

■ While Or L 1969, ch 45, § 8, is part of the act under which the Legislative Assembly relieved the counties of contributions to the Public Welfare Account for use by the State Public Welfare Commission for public assistance purposes, the purpose of the section is clearly to obtain a measure of property tax relief for all property taxpayers of the state over a period of three fiscal years.

In considering § 8, to determine whether it imposes a rule which is of paramount local or paramount state-wide concern, this court cannot do better than to quote from defendant's Trial Brief, pp 5-6:

"It has often been written that 'courts do not live in a vacuum'. It is well, therefore, at the outset for the court to reflect on the general climate in which tax legislation was being considered and passed by the 1969 legislature. In the case of *Southern Pacific Co. v. Heltzel*, 201 Or 1 (26), Justice Rossman aptly stated:

"'The words must be taken in view of the political, economic and social ideas that prevailed at the time of the enactment of the statutes. Amendments and rejected amendments must be viewed as of the time of their consideration, and the act as a whole must be considered throughout the period of amendment as representing the legislation which the legislature believed this state needed.'

"Our representatives were faced with a well-known 'tax revolt' by real property owners, no little of such activity originated in Multnomah County. Organized groups were formed solely for the purpose of seeking real property tax relief. Proposals for the shifting of school taxes and the enactment of a sales tax all indicated that it was the feeling of the taxpayers of the state that real property was carrying an unconscionable burden of public expenses.

"The shifting of the heavy burden of public assistance, borne by the counties for many years, to the State level was unquestionably a part of the intention of the legislature to recognize the demands for property tax relief. To accomplish such relief in fact, it was necessary for the legislature to force a reduction of county levies in amounts commensurate with the public assistance burden being taken over by the State; hence, we now find

ourselves confronted with Section 8, Chapter 45, Oregon Laws 1969."

This theme is supported by the official minutes of the 1969 Joint Ways and Means Committee of the Legislative Assembly (the sponsors of House Bill 1240 which became Or L 1969, ch 45) for the meeting of February 17, 1969. "Representative Richards pointed out that although this proposal is not referred to as a property tax relief proposal, it will have that effect." (Minutes, p 47.) "Representative Hansell thought this an important policy decision. It is a means by which the Legislature can give some property tax relief and pick up at the state level costs of a program over which the local property taxpayers have no control." (Minutes, p 48.) "Representative Davis said * * * this is a program of property tax relief which can be accomplished without any supplemental revenue, and with no shift in taxation, taking off the property tax rolls 22 million dollars of expenditures over which the local people have no control." (Minutes, pp 48-49.)

In 1969, property tax relief had become a statewide political issue. Many candidates for legislative seats had recognized and discussed it at meetings with the electors, and had committed themselves individually to seek solutions which would increase voters' confidence in government. In its search for methods to achieve this goal in some degree, the Legislative Assembly discovered one area in which the charter and non-charter counties themselves were powerless to act; i.e., local relief through the assumption by the state of the financial burden of public assistance imposed on the counties by legislative acts.

■ Merely assuming the whole burden of public assistance would not give property tax relief unless the

counties were prohibited from using equivalent amounts for other programs. Consequently, § 8 was designed to give some protection to all property taxpayers throughout the state against increased property taxes by prohibiting each county, for a period of three years, from continuing to levy for other purposes in an amount measured by the taxes required to be levied by it in the last year of such levy (1967) for public assistance purposes.

The voters of Oregon indicated in 1916 that they regarded a restraint on property taxes of paramount statewide concern when they initiated and enacted an addition to the Oregon Constitution, popularly known as "the six percent limitation" (Art XI, § 11). With some amendment, its principle has been maintained to this day. The widespread application of the constitutional provision is a matter of statewide concern. Further implementation of the principle by the Legislative Assembly is a matter of paramount statewide concern.

■ Section 8 does not contravene the Oregon Constitution, Art XI, § 11, which defines "tax base." That section sets a ceiling on the county's power to levy taxes without a vote of the people. Section 8 does not seek to raise that ceiling; on the contrary, it reduces it for a specific period, in order to achieve a goal of statewide concern. Nor does § 8 jeopardize county fiscal programs; any new program involving a tax levy can still be achieved if approved by vote of the people. Section 8 is not a legislative amendment of a county charter and is applicable to all counties in accordance with its terms.

Understandably, defendant has urged a construction of § 8 which would retain the charter county's increasing base under Oregon Constitution, Art XI, § 11,

from year to year, by merely deducting the amount of 1967-1968's public assistance levy from the amount otherwise leviable in the three tax years prescribed by the new statute, without impairing the base to be carried forward to the next year. This theory cannot be supported by the statutory language, but raises a question of the legislature's power. (*City of Woodburn v. Tax Com.*, 243 Or 633, 638, 413 P2d 606 (1966); *Boyle v. City of Bend*, 234 Or 91, 98, 380 P2d 625 (1963).)

Since local taxation would seem to be ipso facto a matter of local concern, it is proper to inquire whether a legislature, when regulating the upper limits of taxation of a chartered municipality, can bring about a reduction which is greater than the revenue formerly required of the municipality and now replaced by the state. If it was the intent of the drafters of § 8 to recognize such a limitation, the words are not apt. The amount actually levied by a municipality, reduced from the maximum lawful base for any reason whatsoever, is still the levy to be considered (with two other levies) during the next three years, under the Oregon Constitution, Art XI, § 11.

■ No authority can be found to limit the legislature's reduction of county powers to levy to the amount of revenue provided by the legislature in lieu of the county's levy. In the words of Mr. Justice BELT, in *City of Portland v. Welch*, 154 Or 286, 298, 59 P2d 228 (1936):

"In our opinion, local taxation and indebtedness under certain circumstances may become a matter of concern to the state. * * * Hence the legislature may, by a general law, limit the levying of taxes or incurrence of indebtedness by municipalities: * * *."

The effect of § 8 was to act as a brake for all counties for a limited period on increasing property tax levies. However, it halted no current tax-supported program. It did not curtail the power of the electors to vote new programs "outside" the six percent limitation or to vote a new tax base, thus voluntarily waiving the legislature's offered protection from tax increase. The result is not unjust, oppressive or absurd.

It is concluded that the legislature has acted within the scope of its constitutional powers.

### III

What is the fiscal effect of Or L 1969, ch 45, § 8, upon the Multnomah County tax levy for the tax year 1970-1971?

Section 8 must be construed in connection with the Oregon Constitution, Art XI, § 11, which reads in pertinent part as follows:

"(1) * * * no taxing unit, whether it be the state, any county, * * * or other body to which the power to levy a tax has been delegated, shall in any year so exercise that power to raise a greater amount of revenue than its tax base as defined in subsection (2) of this section. The portion of any tax levied in excess of any limitation imposed by this section shall be void.

"(2) The tax base of each taxing unit in a given year shall be one of the following:

"(a) The amount obtained by adding six percent to the total amount of tax lawfully levied by the taxing unit, * * * in any one of the last three years in which such a tax was levied by the unit;
* * *."

Or L 1969, ch 45, § 8, as pertinent for present purposes, reads:

"Section 8. For each of the fiscal years 1969-1970, 1970-1971 and 1971-1972, * * * a county shall

not levy within its tax base more than an amount equal to its base for the year, reduced by subtracting an amount equal to the amount the county levied in 1967 for public assistance purposes as required under ORS 411.170 or 411.180. * * *"

The word "levy" and its derivatives, as used in the material quoted above, must be clearly understood. "Levy" has various meanings and must be determined in its context. It may be used in reference to either legislative or administrative functions of taxation. *Alpha Beta Acme Markets, Inc. v. City of Whittier*, 262 Cal App2d 16, 68 Cal Rptr 327 (1968). See also 25 Words and Phrases 15, 16.

In *Rice v. Shealy*, 71 SC 161, 168, 50 SE 868, 870 (1904), it is stated:

" 'Three things are essential to a tax, as that term is understood by our Constitution: First, the ascertainment of a sum certain, or that can be rendered certain, to be imposed on the collective body of taxpayers; second, a legal imposition of that sum as an obligation on the collective body of taxpayers; third, an apportionment of such sum among individual taxpayers so as to ascertain the part or share that each should bear. * * * The first two acts above described * * * are essentially legislative acts or acts proper directly to the lawmaking functions of government. * * * The third act, namely the apportionment of the whole sum imposed by way of tax on the collective body of taxpayers upon the separate individuals composing that body, is usually an administrative act performed under specific statutory directions * * *.' "

In *Carkonen v. Williams*, 76 Wash2d 617, 458 P2d 280, 286 (1969), it is concluded that the word "levy," when used in connection with the authority to tax, denotes the exercise of the legislative function, whether state or local, determining that a tax shall be imposed

and fixing an amount, purpose, and subject of exaction. Many other cases could be cited to the same effect.

■ In Oregon, the Local Budget Law, ORS 294.305 to 294.520, applicable to all counties, provides for the estimation of revenues, expenditures "and proposed tax levies." ORS 294.321 (3). It seems clear that the "levy" referred to in Oregon Constitution, Art XI, § 11, and in Or L 1969, ch 45, § 8, in the case of Multnomah County, is the levy described in subsection (2) of ORS 294.435. The tax levy referred to in that subsection is one of the "budget documents" defined in subsection (5) of ORS 294.311. The tax levy is physically manifested by the notice filed with the assessor as required by ORS 310.060. (See plaintiff's Exhibits 1, 2 and 3.)

We are here concerned with the lawful levy for 1970-1971 permitted to Multnomah County under Oregon Constitution, Art XI, § 11. For the tax year 1967-1968, Multnomah County levied within its tax base the sum of $22,479,663 (see plaintiff's Exhibit 1); for the tax year 1968-1969, $23,828,442 (see plaintiff's Exhibit 2); and for the tax year 1969-1970, the sum of $22,918,132 (see plaintiff's Exhibit 3). Since the levy for the tax year 1968-1969 was the highest of the three levies preceding the tax year 1970-1971, six percent of that levy would be $1,429,707. Added to $23,828,442, the highest lawful levy for Multnomah County for 1970-1971 within the six percent limitation of the Constitution would be $25,258,149. Under Or L 1969, ch 45, § 8, this tax base must be "reduced by subtracting an amount equal to the amount the county levied in 1967 for public assistance purposes * * *."

The parties disagree as to the amount which Multnomah County *levied* in 1967 for public assistance pur-

poses. To resolve the conflict, reference must be made to the Local Budget Law.

The Local Budget Law appears to provide for three types of funds: The "special revenue fund," meaning a fund properly authorized and used to finance particular activities from the receipts of specific taxes or other revenues (see subsection (24) of ORS 294.311); the "working capital fund," (see subsection (25), ORS 294.311, not relevant to the present question); and the "general fund," financed by general revenues (see subsection (2) of ORS 294.351).

Counties have budgeted and accounted for their welfare expenditures in different ways: One method has been to budget and account for public assistance in a separate fund, in which all the revenues are considered to be special revenues and any difference between the proposed expenditures and the anticipated special revenue is made up by a tax levy specifically for that fund. A second method is to budget for public assistance expenditures in the general fund. See 34 Op Atty Gen 1043, 1050 (1970).

Defendant did not follow either of these two procedures in its 1967-1968 budget (see defendant's Exhibit B). It estimated its expenditures and made appropriations for public assistance for the year 1967-1968 in a separate fund designated "Public Assistance Fund." For the purposes of this fund, it set aside anticipated revenues from the alcoholic beverage taxes to be paid to it pursuant to ORS 473.210, refunds from the State Welfare Commission, and anticipated privilege taxes to be paid to it by the state pursuant to ORS 320.100. Prior to 1965, the moneys paid by the state to the county on account of the alcoholic beverage tax were required to be deposited in the county public

assistance fund, but this requirement was deleted by Or L 1965, ch 141, § 1. Under the amendment to ORS 320.100 by Or L 1967, ch 323, § 1, payments made to the county from privilege tax receipts collected by the state were no longer proportioned to the amount expended by each county for old-age assistance during the preceding fiscal year and were no longer required to be placed in a special fund for old-age assistance; instead, such revenues were to be placed in the general fund of the county. There appears to be no statutory provision requiring that a refund from the State Welfare Commission to the county be considered a "special revenue." However, the county had formerly earmarked these items as special funds and continued to do so in 1967 in the following anticipated amounts: Alcoholic taxes from the state, $320,000; refund from State Welfare Commission, $150,000; privilege taxes, $30,000 (see defendant's Exhibit B, p 333). The total of $500,000 was appropriated by the 1967-1968 budget but not levied. In addition, the county appropriated $2,235,916 for public assistance from the general fund and this amount was included in the levy. Defendant did not levy a specific tax for the public assistance fund as such. Plaintiff argues that in 1967-1968 the defendant really financed the entire public assistance program from general fund revenues, as if those items contained in the public assistance fund had been made a part of the general fund. There is no doubt that, after the 1965 and 1967 amendments referred to above, the receipts from the state could have been made a part of the general fund of the county.

The county's position is shown by its Trial Brief, pp 15-16:

"* * * The difference of $500,000.00 having

been budgeted as anticipated revenue from sources other than ad valorem taxes, the defendant county took the position that such amounts should not be included in the term 'levied in 1967' as that term is used in Section 8 of Chapter 45, Oregon Laws 1969. As previously stated, the $500,000.00 was eliminated from the county's appropriation for public assistance and approved by an opinion dated June 20, 1969 of the Department of Revenue (attached hereto for reference) [defendant's Exhibit H] in fixing the tax base limits for the 1969-1970 budget.

"* * * * *

"Referring to page 333 of the county's 1967-68 budget [defendant's Exhibit B], it will be noted that the funds totaling $2,735,916.00 were appropriated to meet an estimated state call for the county's share of public assistance. The sum of $500,000.00 was appropriated within the Public Assistance Fund from the following sources:

| | |
|---|---:|
| "Alcoholic Taxes from State | $320,000.00 |
| "Refund from State Welfare Commission | 150,000.00 |
| "Privilege Taxes | 30,000.00 |
| | $500,000.00 |

"Even though the appropriation was made, it did not represent any levy of taxes nor a transfer of funds from the General Fund. The sum of $2,235,-916.00 was appropriated in the Public Assistance Fund and is represented by a transfer of cash from the General Fund as shown on page 32 of defendant's Exhibit 'B'. Since the General Fund required a levy of taxes in this amount, to wit: $2,235,916.00, to provide the funds for the transfer of cash, this would correctly represent the amount referred to in Section 8 of Chapter 45, Oregon Laws 1969, as the taxes levied for public assistance in 1967. This follows the directions of the Department of Revenue sent to counties in 1969. (See Dept. of Revenue

memo, dated June 20, 1969, attached.)" [Defendant's Exhibit H.]

■ We have concluded that Or L 1969, ch 45, § 8, is a statute of statewide concern, enacted for the benefit of all property taxpayers in the state. It follows that it must be applied uniformly, to the fullest possible extent, among the several counties, and not be dependent upon a diversity in county budgeting methods which is unsupported by law. Since there were no statutes requiring special revenue funds for public assistance in 1967-1968, the application of § 8 cannot be distorted by the designation of "special revenue fund" in the county budget when ORS 320.100 and Or L 1965, ch 141, § 1, provided that the state payments involved were to be applied to general government expenses.

■ Recognition must be given to the difference between budget "appropriations" and the "levy" of taxes needed to supplement nontax revenues in order to meet approved budgeted monetary requirements within the county's tax base. Since there is no provision for utilizing "other" resources to satisfy in full any particular part of the general fund expenditures, it is logical to conclude that all general fund revenues, whether tax or nontax, are used to finance all general fund appropriations ratably.

■ To exclude completely or to include completely these nontax revenues in the computation of the levy for public assistance in 1967 is illogical and unsupported by law. However, no statutory formula has been supplied. In 34 Op Atty Gen 1043 (1970), prepared for the Director of the Department of Revenue, the Attorney General dealt with this problem (at page 1051) as follows:

"* * * Since all appropriations within the Gen-

eral Fund benefit from the nontax revenues as much as they benefit from the tax revenues, this method of computing the tax levy for public assistance by reducing the appropriation(s) by all nontax levies is also incorrect. Therefore, it is concluded that the better method of computing the amount of tax levied for public assistance for those counties which in 1967, financed their public assistance programs from the General Fund, is by the following formula:

$$\text{"A } x\frac{L}{T}= P$$

"A is the appropriation(s) made in 1967 for public assistance within the General Fund

"L is the levy of taxes for the General Fund for 1967

"T is the total appropriations for General Fund purposes for 1967

"P is the levy for public assistance for 1967 which is to be used by the county in computing the limitation under Chapter 45, Section 8 [1969] Oregon Laws 88

"By this formula, all appropriations within the General Fund are given an equal share of the nontax revenues as well as an equal share of the tax revenues. This computation does not overstate either the amount levied for 1967 for public assistance purposes nor does it permit a county to arbitrarily reduce appropriations in the General Fund for public assistance purposes. This method of determining the levy of taxes for public assistance purposes is consistent with the method used to determine an estimated tax levy provided in ORS 294.381."

The formula proposed is a reasonable one which could be utilized by the Director of the Department of Revenue pursuant to subsection (2) of ORS 294.495 (the power to make rules and regulations). Since it is

required in order to decide the question, it is adopted by this court.

However, this does not completely resolve the question of the "amount the county levied in 1967 for public assistance purposes as required under ORS 411.170 or 411.180." As contended by the plaintiff, it is necessary to revise the Multnomah County General fund summary of appropriations by deleting the transfer of $2,235,916 from the approved budget for welfare assistance, set forth on page 16 of defendant's Exhibit B, and add, instead, $2,735,916, which is the actual requirement for public assistance and which became the appropriation for that purpose for the 1967-1968 fiscal year. This $500,000 adjustment would increase the total general fund requirements to $32,176,783. General fund revenues must also be increased by $500,000 to reflect the amount to be received from the alcoholic beverage taxes of $320,000, the refund from State Welfare Commission of $150,000, and the privilege taxes to be received from the state in the amount of $30,000, which was omitted from the general fund summary of revenues appearing on pages 8 through 15 of defendant's Exhibit B. The total "other revenues" then would be $7,894,187 and the grand total of all revenues would be $32,176,783. It is plaintiff's contention that these adjustments must be made to the 1967-1968 Multnomah County budget to properly reflect within the general fund the actual appropriations made for public assistance, the actual revenues accruing to the general fund, and the actual tax levy made for general fund purposes. It should be noted that the amount of the tax levy for 1967-1968 would not change because both the appropriations and the nontax revenues have been increased by the same amount, $500,000. The plaintiff's

interpretation and calculations are adopted by the court.

Applying the Attorney General's formula to these revised figures, the county's levy in 1967-1968 for public assistance purposes, under § 8, would be $1,826,361; that is:

$$A \text{ x} \frac{L}{T} = P, \text{ or}$$

$$\$2,735,916 \text{ x } \frac{\$21,479,633}{\$32,176,783} = \$1,826,361$$

The constitutional tax base of Multnomah County for 1970-1971 was $25,258,149; upon subtracting the 1967-1968 general fund levy for public assistance, as required by § 8, the base is reduced to $23,431,788.

The tax levy of Multnomah County for the fiscal year 1970-1971 must therefore be reduced to $23,431,-788. The Director of the Department of Assessment and Taxation, Multnomah County, must disregard the Notice of Levy filed with him by the County Commissioners of Multnomah County on June 30, 1970, where such notice is in conflict with this decision.